J-A20024-19

2019 PA Super 360

| | | |
|---|---|---|
| DAVID CRAGLE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FRANK O'BRIEN, M.D.; JAMES M. | : | No. 116 MDA 2019 |
| MATUCCI, JR., M.D.; AND | : | |
| ORTHOPAEDIC CONSULTANTS OF | : | |
| WYOMING VALLEY, LLC | : | |

Appeal from the Judgment Entered February 20, 2019
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
2013-08944

BEFORE:  GANTMAN, P.J.E., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

OPINION BY McLAUGHLIN, J.:          **FILED: DECEMBER 20, 2019**

David Cragle appeals from the judgment entered in favor of Frank O'Brien, M.D., James M. Matucci, Jr., M.D.,[1] and Orthopaedic Consultants of Wyoming Valley, LLC (collectively "Appellees") following a jury trial in this medical malpractice case. The jury found Drs. O'Brien and Matucci were negligent but that the negligence did not cause harm to Cragle. Cragle argues that the verdict was against the weight of the evidence and that the trial court erred in failing to instruct the jury as to an adverse inference. We affirm.

Cragle initiated this medical malpractice action in July 2013. According to the testimony at trial, Cragle began suffering from knee pain in 2010. In

---

[1] Appellees spell this doctor's name as "Mattucci." Because the caption has not been amended, we will use the spelling contained in the caption—Matucci—in this opinion.

2011, Cragle went to see Dr. O'Brien, who diagnosed Cragle with a potential torn meniscus. N.T., Trial, 5/29/18-6/1/18, at 59. He ordered an MRI, which showed Cragle had a large Baker cyst, which is a pocket of fluid behind the knee. *Id.* at 59-61. Dr. O'Brien aspirated fluid from the cyst. *Id.* at 63-64. Cragle's symptoms did not improve and, on August 1, 2011, Dr. O'Brien excised the cyst. *Id.* at 65-66. The surgery included an incision to the back of the leg. *Id.* at 63.

Cragle scheduled a post-operative appointment for August 15, 2011. *Id.* at 68. On August 4, 2011, Cragle called to re-schedule the appointment to August 12, 2011, because he was scheduled to leave for vacation on August 13, 2011. *Id.* at 68-69. However, Dr. O'Brien was on vacation that day, so Cragle was given an appointment for August 12, 2011, to see Dr. Matucci. *Id.*

Four days before the appointment, Cragle called the office complaining of swelling in his lower leg and foot. He had a Doppler lower extremity exam, which was negative for deep vein thrombosis.[2] *Id.* at 69, 71. Cragle was seen by Dr. Matucci on August 12, 2011. Dr. Matucci noted Cragle had swelling in the calf and posterior portion of the leg, and had bleeding from the back of the knee. *Id.* at 164. Dr. Matucci put a pressure dressing on the wound and

---

[2] "Deep vein thrombosis (DVT) occurs when a blood clot (thrombus) forms in one or more of the deep veins in your body, usually in your legs." Mayo Clinic, Deep Vein Thrombosis, available at https://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/symptoms-causes/syc-20352557 (last visited Oct. 24, 2019).

told Cragle to stay off of, and elevate, the leg, and to follow-up with Dr. O'Brien on the following Monday, August 15, 2011. ***Id.*** at 170.

In addition to the above, the office note for the August 12, 2011, appointment with Dr. Matucci stated that he was admitting Cragle to the hospital because he was having a hard time ambulating, for evacuation of a hematoma[3] and for irrigation of the wound. ***Id.*** at 177. Dr. Matucci testified at trial that he did not know how this information was added to the note, and that the information about hospitalization, evacuation, and irrigation was not accurate. ***Id.*** at 177-82. Dr. Matucci further testified that Cragle did not need to be admitted on August 12, 2011, and that if Cragle had needed to be admitted to the hospital, Dr. Matucci would have done so. ***Id.*** Cragle does not contend that Dr. Matucci sent him to the hospital on August 12, 2011.

The medical record contained a prescription for Oxycodone, which was written by Dr. Matucci and dated the day after Cragle's appointment with Dr. Matucci, August 13, 2011. ***Id.*** at 172. This prescription was not included in the office note. ***Id.*** at 173. At trial, Dr. Matucci testified he provided the prescription on August 12, 2011, but dated it August 13, 2011.[4] ***Id.*** at 176. At his deposition, however, Dr. Matucci testified he did not write a prescription. The prescription was filled on August 13, 2011. ***Id.*** Cragle could not recall

---

[3] "A hematoma is a collection of blood outside of a blood vessel." MedicineNet, Hematoma, available https://www.medicinenet.com/hematoma/article.htm (last visited Oct. 24, 2019).

[4] There does not appear to be any testimony that Cragle had any contact with the medical office or Dr. Matucci on August 13, 2011.

receiving a prescription. *Id.* at 208. He further testified that after August 12, 2011, the next time he had contact with the office was on Monday, August 15, 2011. *Id.* at 223-24.

Cragle saw Dr. O'Brien on Monday, August 15, 2011. Dr. O'Brien noted Cragle had a lot of pain and swelling. *Id.* at 77-78. Dr. O'Brien removed fluid from the knee, and noted evidence of potential sepsis[5] and probably an element of hematoma or seroma[6] in the calf. *Id.* at 78, 80. Dr. O'Brien planned to check the fluid analysis and the gram stain[7] and cultures. *Id.* at 81-82.

On August 16, 2011, Cragle was admitted to the hospital for surgery, including debridement of the incision and knee arthroscopy, washing out the knee, and synovectomy. *Id.* at 88. During the surgery, Dr. O'Brien discovered a torn meniscus, which he treated. *Id.* at 89. Cragle had an infection in his knee, but not in his calf. *Id.* at 89. Cragle remained in the hospital for six days and required intravenous antibiotic therapy. *Id.* at 91-92. Cragle was re-

---

[5] "Sepsis is the body's extreme response to an infection." Centers for Disease Control and Prevention, What is Sepsis, available at https://www.cdc.gov/sepsis/what-is-sepsis.html (last visited Oct. 24, 2019).

[6] "A seroma is a collection of fluid that builds up under the surface of your skin." Healthline, Seroma: Causes, Treatment, and More, available at https://www.healthline.com/health/seroma (last visited Oct. 24, 2019).

[7] Dr. O'Brien testified that he ordered a gram stain, but it was not completed. N.T., Trial, 5/29/18-6/1/18, at 82. A gram stain is a "method of staining bacteria using a dye called crystal (gentian) violet. [A gram stain] helps distinguish between different types of bacteria." Medical Definition of Gram Stain, available at https://www.medicinenet.com/script/main/art.asp?article key=9583 (last visited Nov. 26, 2019).

admitted two weeks later and Dr. O'Brien did a second arthroscopic procedure on September 8, 2011. *Id.* at 97. Dr. O'Brien testified that 25% of people "who have a washout for an infected knee need to go back and have a washout again." *Id.* Cragle required intravenous antibiotic treatment until October 2011. *Id.*

Cragle continued to treat with Dr. O'Brien through November 2013. *Id.* at 391. Cragle's arthritis worsened and, in December 2011, Dr. O'Brien told Cragle that he should consider knee replacement surgery. Cragle testified he had pain and was unable to properly function for several months, was told he needs a knee replacement, and has been declared permanently disabled from his employment as a gas company meter reader. *Id.* at 215-19.

Cragle's causation testimony included testimony from his liability expert James Kipnis, M.D:

> [Q] . . . [A]s a result of the delays in the care that you mentioned earlier, what happened to Mr. Cragle specifically?
>
> A Well, he did have to go back to the operating room for a second, you know, wash out, irrigation debridement. And he did go on to develop increased degenerative arthritis of his knee and having difficulty with the knee.
>
> Q And in terms of the advancement of the infection and limitation to the knee, was that also as a result of the things we've been talking about today?
>
> A Well, it does appear that the degenerative findings – the degenerative occurrence was a result of the infection and the surgeries he had done.

N.T., Deposition, 5/16/18, at 42-43. Cragle also claims medical expert Gerald Dworkin, D.O. provided causation testimony:

Unfortunately, post procedure, there was complication of significant swelling, and the associate of the operative surgeon took over the care during this aspect of the clinical course.

So we have a situation where there were some complications following this. There turned out to require other arthroscopic surgical interventions in order to handle the swelling and the complications of sepsis or infection that occurred.

So essentially over the course of a couple months, though a second arthroscopy which was performed in September, a lot of manipulation and care to the knee was required, as a result of this complicated clinical course.

N.T., Deposition, 5/9/18, at 16.

The defendant doctors presented expert causation testimony that included testimony that there was nothing about the timing of treatment that would have put Cragle at increased risk for worse arthritis. N.T., Trial, 5/29/18-6/1/18, at 285. In addition, the expert testified that the combination of removing the torn meniscus, the infection, and the arthritis would cause arthritis to worsen, and that having the surgery on August 12, 2011, rather than August 16, 2011, would not have made a difference because it was still within a week of the infection. *Id.* at 300.

In May 2018, a week and a half prior to trial, Cragle filed a motion to amend the complaint to include, among other things, a claim for punitive damages based on the allegedly altered medical records. This motion referenced sections 511(c) and 505 of the Medical Care Availability and Reduction of Error Act ("MCARE"). 40 P.S. 1303.511, 1303.505. Cragle withdrew this motion. N.T., Trial, 5/29/18-6/1/18, at 430. Cragle also filed a

Supplemental Pretrial Statement, in which he requested that the court instruct as to Pennsylvania Suggested Standard Jury Instruction 5.70, Intentional Alteration or Destruction of Documents, which provides:

> 1. If a party intentionally [alters] [destroys] a relevant document, and
>
> 2. Does not satisfactorily explain why [he] [she] [altered] [destroyed] the document, you may find that this document would have been unfavorable to the party who [altered] [destroyed] it.

Pa.S.S.J.I. (Civ) 5.70.

During a side-bar discussion at trial, Appellees stated their concern that Cragle was attempting to raise a negligent record-keeping cause of action. Cragle stated he was exploring the alteration because of the request for an "adverse inference instruction":

> The Court is aware of our most liked [sic] request for an adverse inference given the potential that the records were altered, and we're exploring that, Your Honor; and that is – there is nothing that we're doing beyond what they did in terms of the manner in which they kept the records.
>
> The MCARE Act is very clear that it's unprofessional conduct to alter records; and if a record is altered, an adverse inference should be given.
>
> In terms of exploring that, other than to ask them about how they kept the records and what is in the records; and that is what we've done.

N.T., Trial, 5/29/18-6/1/18, at 112.

After Dr. Matucci's testimony, Appellees requested a mistrial, arguing that Cragle brought up "something about altering records and you can be sanctioned for that. That is not an issue in this case. There is no expert to

testify on it. He had no one – no document expert coming in and saying these were altered." *Id.* at 189.[8]

The trial court denied the request for a mistrial but did inform the parties that it would "instruct the jury that the questioning of Dr. Matucci relating to his entries into [Cragle's] medical chart may be considered for purposes of impeachment only; and, I will explicitly state that that line of questioning may

---

[8] Following questions about the medical notes, Cragle's counsel questioned Dr. Matucci as follows:

> Q: Doctor, do you agree with me that physicians are required to put information in patients' charts that is accurate?
>
> A: Absolutely.
>
> Q: Your entries in charts must clearly establish the care provided to the patients?
>
> A: Yes. We do our best to do that.
>
> Q: That if a physician does alter, in any way, a medical chart, that that is considered unprofessional conduct in Pennsylvania?
>
> A: It is.
>
> Q: If a physician does alter a patient's medical chart, you can be subject to a license suspension?
>
> A: That's correct.
>
> [DEFENSE COUNSEL]: Objection. Move to strike, Your Honor.
>
> THE COURT: Sustained. The Jury shall disregard the last question and answer with regard to license suspension.

N.T., Trial, 5/29/18-6/1/18, at 184.

not be considered with respect to the issues relating to [Appellees']

negligence, breach of the standard of care or cause of injury." ***Id.*** at 192.

After both sides had rested, the following exchange regarding an

"adverse inference instruction" occurred:

> [CRAGLE'S COUNSEL]: Judge, I did want to bring up the adverse inference instruction at this point, just make a more formal request for it, given the testimony in the case regarding Dr. Matucci not being able to explain what was in the note. Now, I understand we didn't get to altering the record, but we have a situation where there's two sentences in the note that are contradictory to the remainder of what is in the note and what happened.
>
> It would be [Cragle's] position that if you're not able to explain what is in the note, that also activates the adverse inference that can happen in a situation such as this. So, we would ask for the instruction at this point.
>
> THE COURT: But, that is where use of the discrepancy would be shifting over into the realm of the issues relating to medical negligence and so forth as opposed to credibility.
>
> [CRAGLE'S COUNSEL]: Well, yeah.
>
> THE COURT: You're able to use it for impeachment; but, what fact is it that would be inferred based on what is an admitted discrepancy in his entries into the chart where Mr. Cragle was completely in agreement that there was no such instruction? The trial testimony was that there was no such instruction regarding hospitalization and so forth.
>
> [CRAGLE'S COUNSEL]: Well, again, I think – again this was in the brief that we filed back when we were requesting the inclusion of the punitive damages claim that we then did withdraw.
>
> In that, I did cite to a case which is a Philadelphia County case . . . and in that, I cited – it was stated "it was held the provision" – that is an adverse instruction – "was not exclusive in that an adverse inference instruction may be provided against a medical provider pursuant to preexisting

common law where the Plaintiff need only show the Defendant lacks satisfactory explanation of why it failed to produce a missing document."

So, in this case, it's the same angle that we would be taking; that, he's unable to explain the contents of the note.

[DEFENSE COUNSEL]: But, there is no missing document. There is – it's not like he came in here and said, Ah-hah. I remembered I told him to go to the hospital and he didn't.

[CRAGLE'S COUNSEL]: I understand. I'm not saying there is.

[DEFENSE COUNSEL]: There is nothing about the discrepancies that goes to his benefit.

THE COURT: I looked at this and preliminarily said I would defer, and I will give it one final review this evening. I will tell you my inclination is, I will not be charging on adverse inference; and, I think the cited authority is [ina]pposite to our facts. So, get here for 9:00, and I will – what I generally do is write them out so you'll be able to see.

N.T., Trial, 5/29/18-6/1/18, at 429-31.

The following day, after providing counsel a copy of the charge it was planning to give, which did not include an adverse inference instruction, the court asked whether there were "any other submissions," and Cragle's counsel said, "None." *Id.* at 437. Defense counsel stated that he "thought [the court] was . . . going to give the same charge that you gave during the trial, that any questions about the medical records were not relevant to the standard of care or causation." *Id.* at 438. The Court stated, "I won't necessarily go in exactly this order, but you can see below 4.120, evidence admitted for a limited purpose." *Id.* After the court instructed the jury, it asked the parties whether there were "any other submissions with regard to the court's charge."

*Id.* at 495. Cragle's counsel again stated, "None, Your Honor." *Id.* Following deliberations, the jury found that Appellees were negligent, but that their negligence did not cause harm to Cragle.

After trial, Cragle filed a Supplemental Trial Statement in which he claimed that during the charging conference, he requested that the court instruct the jury using Pennsylvania Suggested Standard Jury Instruction § 14.40, Alteration or Destruction of Medical Records, and that the court denied it. The certified record does not contain an on-the-record request for this instruction before or during trial.

Cragle also filed a Motion for New Trial, arguing the verdict was against the weight of the evidence and that the court erred in failing to find an alteration of medical records under MCARE and in failing to give an adverse inference jury instruction. The trial court denied the motions and entered judgment in favor of Appellees. Cragle filed a Notice of Appeal.[9]

Cragle raises the following issues:

> I. Whether the jury verdict finding no causation was against the weight of the evidence?
>
> II. Whether the trial court's failure to give an adverse inference instruction[] during the trial and as a [sic] jury instruction on alteration of a medical record was error?

Cragle's Br. at 4.

---

[9] Cragle initially filed this appeal before final judgment had been entered. We directed Cragle to file a praecipe with the trial court prothonotary to enter judgment. Cragle complied, and the prothonotary entered final judgment on February 20, 2019.

Cragle first argues that the jury's finding that Appellees' negligence did not cause harm to Cragle was against the weight of the evidence. He claims that Appellees failed to diagnose and treat a knee infection that resulted in Cragle's knee becoming septic. He argues that, because it became septic, Cragle underwent two surgical procedures, required a PICC[10] placement for intravenous antibiotics, suffered harm and limitations related to the infection, and had damage to his knee due to the acceleration of osteoarthritis caused by the sepsis. Cragle claims that the defense experts opined only as to whether the delay in treatment caused an acceleration of osteoarthritis, and failed to opine as to whether there was "injury and harm to [Cragle] caused by the infection." Cragle's Br. at 17. He also claims Appellees' causation testimony was inconsistent. Cragle contends that Appellees "provided no causation testimony in the case related to the infection and the impact the infection had on [Cragle]." *Id.* at 23. Cragle concludes that the jury's finding that the Appellees breached the medical standard of care in the treatment of Cragle, "along with the testimony of each medical expert in the case regarding causation of injury strongly indicates that the jury's decision on causation was against the weight of the evidence." *Id.* at 24.

Our review of the denial of a motion for a new trial based on weight of the evidence is limited. We must determine whether the trial court abused its

---

[10] PICC is a "peripherally inserted central catheter," which is a "long, thin tub that goes into your body through a vein in your upper arm." MedlinePlus, available at https://medlineplus.gov/ency/patientinstructions/000461.htm (last visited Nov. 12, 2019).

discretion in denying a new trial, not whether the verdict, in this Court's opinion, is against the weight of the evidence. ***Corvin v. Tihansky***, 184 A.3d 986, 992 (Pa.Super. 2018); ***In re Estate of Smaling***, 80 A.3d 485, 490 (Pa.Super. 2013) (*en banc*). "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge." ***Id.*** (quoting ***Phillips v. Lock***, 86 A.3d 906 (Pa.Super. 2014)). We have noted that "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence." ***Id.*** (quoting ***Phillips***, 86 A.3d at 919).

The trial court rejected the weight challenge, reasoning as follows:

> A review of the record in the present case, and specifically the testimony of defense orthopaedic surgery expert Dr. Jack Hanzes and defense physiatrist expert Dr. Michael Wolk, reveals that there was conflicting testimony among the experts regarding whether the timing of the treatment by Dr. Matucci and Dr. O'Brien caused any harm to [Cragle]. Under these circumstances, the jury's failure to find that any negligence on the part of [Appellees] was a factual cause of any harm to [Cragle] did not "shock" the court's "sense of justice" so as to merit the awarding of a new trial.

Trial Court Op., filed Mar. 8, 2019, at 7 ("1925(a) Op.").

We conclude this was not an abuse of discretion. Cragle bore the burden of proving, by a preponderance of the evidence, that Appellees' negligence caused him harm. Cragle presented minimal testimony as to causation, and Appellees presented opposing testimony. The evidence presented as to

causation was not so grossly one-sided as to make rejection of the weight claim an abuse of discretion.

Cragle next argues the trial court erred when it failed to give an adverse inference jury instruction. Cragle claims "the note created by James Matucci, M.D. is contradictory and clearly was done at some point for self-preservation." Cragle's Br. at 24. He notes that the care in the last two sentences of the note, that is, that Dr. Matucci was admitting Cragle to the hospital for possible open wound evacuation, did not occur and that Dr. Matucci agreed it did not occur on August 12, 2011. Rather, that care was provided on Monday, August 15, 2011. Cragle claims it "mirrors the care that was identified that should have been done by Dr. Matucci" on August 12, 2011. *Id.* at 25. Cragle maintains that Dr. Matucci could not explain why the last two sentences were in the chart.

Cragle also notes that the prescription for Oxycondone contained in the record is dated Saturday, August 13, 2011, rather than Friday, August 12, 2011. At his deposition, Dr. Matucci stated he did not provide a prescription and at trial he agreed that the prescription was misdated. Cragle stated that "[w]hether Dr. Matucci was aware of [Cragle's] deteriorating condition on August 13, 2011 was an issue in the case and Dr. Matucci's testimony at trial regarding the misdated prescription order allowed him to testify that he had no contact with [Cragle] on Saturday . . . despite their being an order in the chart showing he wrote out a prescription dated Saturday, August 13, 2011." *Id.* at 29.

Cragle maintains he did not waive the adverse inference issue, citing the transcript where the adverse inference instruction was discussed. Cragle argues that the court should have instructed as to an adverse inference because it can be assumed that a litigant who altered or destroyed relevant documents was motivated by a concern that the material altered or destroyed would have been unfavorable to that party's position. He further argues that the trial court is incorrect that any error was harmless because any adverse inference would have gone to negligence, not causation. Cragle asserts that "[t]here is little doubt that a juror could use an adverse instruction as an ingredient of causation." *Id.* at 33 (citing *Kavach v. Soloman*, 732 A.2d 1 (Pa.Super. 1992)).

"We review the trial court's jury instructions for an abuse of discretion or legal error controlling the outcome of the case." *Meyer v. Union R.R. Co.*, 865 A.2d 857, 862 (Pa.Super. 2004) (citing *Raskin v. Ford Motor Co.,* 837 A.2d 518 (Pa.Super. 2003)).

There are two adverse instructions at issue in this case: (1) the adverse inference instruction used in civil cases where a party intentionally alters or destroys a document, Pa.S.S.J.I. (Civ) 5.70; and (2) the adverse inference instruction used in medical malpractice cases where medical records are altered or destroyed, Pa.S.S.J.I. (Civ) 14.40.

Regarding the last instruction, MCARE section 511(c) states, "Alteration of records--in any medical professional liability action in which the claimant proves by a preponderance of the evidence that there has been an intentional

alteration or destruction of medical records, the court in its discretion may instruct the jury to consider whether such intentional alteration or destruction constitutes an adverse inference." 40 P.S. 1303.511(c). This provision is embodied in Section 511(a) in Suggested Standard Instruction 14.40, which provides:

> If you find that there was an intentional alteration or destruction of medical records by the defendant[s] in this case, and that there has been no satisfactory explanation for that alteration or destruction, you may infer that the records or portions so altered or destroyed would have been unfavorable to the defendant[s].
>
> . . .
>
> Therefore, if you find that any of these three explanations applies to an intentional alteration or destruction of medical records in this case, you may not draw an inference unfavorable to the defendant[s] for that alteration or destruction. If, however, you find that none of these explanations apply, you may draw such an inference.

Pa.S.S.J.I. (Civ) 14.40.

Similarly, Suggested Standard Instruction 5.70 provides:

> 1. If a party intentionally [alters] [destroys] a relevant document, and
>
> 2. Does not satisfactorily explain why [he] [she] [altered] [destroyed] the document, you may find that this document would have been unfavorable to the party who [altered] [destroyed] it.

Pa.S.S.J.I. (Civ) 5.70.

Prior to trial, Cragle requested Suggested Standard Instruction 5.70. The parties and the court discussed the "adverse inference" instruction during trial. N.T., Trial, 5/29/18-9/1/18, at 429-31. Post-trial, Cragle filed a

document claiming he requested Instruction 14.40 at the charging conference. However, there is no transcript of the charging conference in the certified record.

The trial court unequivocally states that Cragle never requested Instruction 14.40 before trial:

> [T]he Court would initially note that while [Cragle] did file a "Supplemental Pretrial Statement" on May 22, 2018, in which he requested Instruction 5.70 (Intentional Alteration or Destruction of Documents) of the Pennsylvania Suggested Standard Civil Jury Instructions be given to the jury, at no time . . . prior to the conclusion of the trial did he file a Point for Charge requesting the Court to charge the jury with Instruction 14.40 (Alternation or Destruction of Medical Records). In addition, following the Court's charge to the jury, the Court inquired of counsel for the parties if there were "any other submissions with regards to the Court's charge," to which [Cragle's] counsel responded "None, Your Honor." Under these circumstances, the Court is of the opinion that [Cragle] has waived his right to appeal this issue.

1925(a) Op. at 4-5.

We see no reason to disturb the trial court's decision. Cragle has waived any claim that the trial court erred in failing to instruct using Standard Instruction 14.40 in multiple ways. He did not ensure that a transcript of the charging conference was placed in the certified record, nor did he submit a proposed jury instruction as to 14.40, or the applicable MCARE statute. Although MCARE is mentioned during some of the discussion, it is not clear that Cragle was requesting an adverse inference instruction under MCARE, rather than Suggested Standard Instruction 5.70.

In any event, we agree with the trial court that "the medical record 'alteration' in this matter was not the type or degree which supported the 'adverse inference' instruction." 1925(a) Op. at 4-5. The jury heard the testimony regarding the medical record notes, and heard the testimony that Dr. Matucci could not explain why the note was there. The note had information concerning events that all parties agreed did not happen, but there is no contention that the remainder of the note was inaccurate or that any information was missing from the note. Under the facts of this case, we see no reason to disturb the trial court's decision.

The trial court also found that, even if failure to give the instruction was error, the error would be harmless:

> Finally, insofar as the "adverse inference" instruction, if given in the present case, would have primarily related to the issue of negligence, and the jury found both Defendant Physicians to have been negligent, it is difficult to understand how any alleged error in declining to give the instruction would be anything other than "harmless error." ***See generally Harman ex rel Harman v. Borah***, 756 A.2d 1116, 1122 (Pa. 2000) (The harmless error doctrine underlies every decisions to grant or deny a new trial).

1925(a) Op. at 4.

We agree. In this case, any adverse inference would have supported a finding of negligence. Because the jury found Appellees negligent, any error due to the failure to provide an adverse inference instruction would have been harmless.

Judgment affirmed.

- 18 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/20/2019