J-A14008-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CHRISTOPHER MARAGOS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES P. BRADLEY, UPMC | : | |
| COMMUNITY MEDICINE, INC. AND | : | |
| ROTHMAN ORTHOPAEDIC | : | No. 2310 EDA 2023 |
| ASSOCIATES II, P.C. | : | |
| | : | |
| | : | |
| APPEAL OF: RECONSTRUCTIVE | : | |
| ORTHOPAEDIC ASSOCIATES, II, P.C. | : | |

Appeal from the Judgment Entered August 1, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  191100972

BEFORE:  LAZARUS, P.J., STABILE, J., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.:          **FILED AUGUST 30, 2024**

Reconstructive Orthopaedic Associates, II, P.C. (ROA)[1] appeals from the judgment,[2] entered in the Court of Common Pleas of Philadelphia County, on a $43.5 million jury verdict in favor of Appellee Christopher Maragos (Plaintiff) and against ROA and Defendants James P. Bradley, and UPMC Community

---

[1] Plaintiff filed his complaint against Rothman Orthopaedic Associates II, PC. However, on March 13, 2020, the parties stipulated to amend the caption of the complaint to reflect Defendant's proper name, Reconstructive Orthopaedic Associates II, PC, hereinafter referred to as "ROA."

[2] ***See Taxin v. Shoemaker***, 799 A.2d 859 (Pa. Super. 2002) (order denying post-trial motions not appealable until order reduced to judgment).

Medicine, Inc., following the denial of post-trial motions.[3] After careful consideration, we affirm on the basis of the well-reasoned opinion authored by the Honorable Charles J. Cunningham, III.

Plaintiff is a former NFL safety, special teams player, and team captain who signed a three-year/$4 million contract with the Philadelphia Eagles in 2014.[4] Plaintiff's contract was extended in 2016 for three years/$6 million. Plaintiff was, at that time, the highest paid special teams player in the NFL.

During an October 12, 2017 game against the Carolina Panthers, one of Plaintiff's teammates collided with Plaintiff's right knee, causing it to hyperextend.[5] The next day, October 13, 2017, Plaintiff had an MRI taken in Philadelphia. *See* Jefferson Outpatient Imaging MRI Right Knee, 10/13/17, at 1 (MRI Impression #3 states "[c]omplex tear of the posterior root attachment of the medial meniscus (new since 2015) with mild meniscal extrusion."); *see id.* at 1-2 (MRI Medial Compartment notes "[t]here is a complex, predominantly radial tear involving the posterior root attachment of the medial

---

[3] The jury apportioned ROA's liability at 33% of the full verdict, or $14,355,000.00. However, the court granted Plaintiff's Pa.R.C.P. 238 motion for delay damages in the amount of $1,408,658.12, for a total recovery against ROA in the amount of $15,763,658.12. Additionally, although the jury also returned a verdict against Defendants Dr. James P. Bradley and Community Medicine, Inc., Plaintiff entered into a *pro rata* settlement agreement with Dr. Bradley and his practice, Community Medicine, Inc.

[4] Plaintiff was selected as an alternate on the N.F.C. Pro Bowl team in 2014.

[5] During the game, an x-ray was taken of Plaintiff's right knee to rule out a fracture.

- 2 -

meniscus with a tiny 4 mm nondisplaced meniscal fragment. This tear is new since the prior MRI from meniscal extrusion."). ROA and at-the-time Eagles head team physician, Dr. Peter DeLuca, reviewed the MRI results with Plaintiff and explained that Plaintiff had a complete tear of his posterior cruciate ligament (PCL), a partial tear of the lateral collateral ligament (LCL), and "a tear of the posterior horn root of the medical meniscus [with] mild extrusion" and recommended surgical intervention. **See** N.T. Jury Trial, 2/9/23, at 53, 62-64. After consulting with his agent and team physician, Plaintiff selected Dr. Bradley, a Pittsburgh-based orthopedic sports medicine surgeon and head team physician for the Pittsburgh Steelers, to be his surgeon.

Doctor Bradley talked to Dr. DeLuca the day before he operated on Plaintiff and told Dr. DeLuca that Plaintiff's PCL was completely torn and that he was not sure if the meniscal root was torn, but that he would look at the root during the surgery to see if it needed to be fixed. **Id.** at 67. In particular, Dr. Bradley testified that Plaintiff had suffered a partial tear of the medial meniscus at the posterior horn that did not involve the meniscal root, a grade II LCL injury, and a completely ruptured PCL. **Id.**, 2/7/23, at 156, 191. **See also id.** at 199, **id.**, 2/8/23, at 100 (Doctor Bradley testifying Plaintiff had Type I "partial tear of the posterior horn of the root of [the] medial meniscus that was [] a partial tear").

On November 8, 2017, Dr. Bradley performed a right knee diagnostic arthroscopy and PCL reconstruction on Plaintiff's right knee, reserving the decision as to whether the posterior lateral corner and the LCL had to be

repaired until Plaintiff was under anesthesia.[6] *Id.*, 2/7/23, at 192-93. Doctor Bradley specifically testified, after probing the area during surgery, the Type I partial root tear with which he had previously diagnosed Plaintiff did not require surgical intervention because it was a "stable tear." *Id.*, 2/8/23, at 101-03; *id.*, 2/7/23, at 200-01 (Doctor Bradley testifying Plaintiff's root was "totally intact" during November 2017 surgery).

Following surgery, Dr. Bradley ordered a course of physical therapy and rehabilitation for Plaintiff to take place in Philadelphia with ROA. *See id.* at 103 (Doctor Bradley testifying he provided overview of rehab program for Plaintiff to trainers who would then implement day-to-day protocol). Initially, Plaintiff's rehabilitative activities included muscle-strengthening exercises and, six weeks post-surgery, using a stationary bike. By January 2018, Plaintiff was walking unaided and putting his full body weight onto his knee.

In conjunction with Dr. Bradley's direction, ROA Doctors Peter DeLuca, Christopher Dodson,[7] Paul Marchetto, and Matthew Pepe[8] implemented and oversaw Plaintiff's rehabilitation from November 2017 through December 2018. *See* Deposition of James P. Bradley, M.D., 6/2/21, at 49 ("[I]t is a joint

_____

[6] Doctor Bradley told Plaintiff he would assess whether he needed to fix his LCL during the surgery. *See* N.T. Jury Trial, 2/3/23, at 32.

[7] Plaintiff originally named Drs. DeLuca and Dodson as individual Defendants, but withdrew them from the lawsuit shortly after filing the complaint.

[8] All four doctors practiced at the Rothman Institute in 2017-2018. *See* N.T. Jury Trial, 2/9/23, at 169.

decision [among the ROA doctors and Philadelphia Eagles therapists/staff] and me when we should progress."). Doctor DeLuca testified that he "took care of the [team's] orthopedic injuries [and] made the final decisions when it came to orthopedic injuries." N.T. Jury Trial, 2/9/23, at 54. Specifically, Dr. DeLuca testified that his day-to-day duties included evaluating injuries, reviewing MRIs, and making decisions regarding whether injured players could return to play. *Id.* at 55-56.

Doctor Bradley reported back to Dr. DeLuca, post-surgery, that the meniscal root was completely stable and told Dr. DeLuca "specifically . . . not to examine [Plaintiff's] knee [a]nd [that he didn't] want [him] or any of [his] partners or any athletic trainer pulling on . . . the new PCL[.]" *Id.* at 68. In February 2018, Dr. DeLuca looked at Plaintiff's range of motion, but did not test his PCL due to Dr. Bradley's prior instructions. *Id.* at 72.

Doctor Bradley examined Plaintiff in March 2018 and noted that Plaintiff's reconstructed PCL was intact and that his MCL, LCL, and ligaments were healthy and stable. *See* N.T. Jury Trial, 2/3/23, at 45-46 (Plaintiff testifying Dr. Bradley told him "[h]e's doing quite well[, that [the] PCL repair] was tight, it looked good and he was happy with it); *but see id.* at 45 (Plaintiff testifying he "just wasn't quite feeling quite right[, he] was kind of getting swelling in that time and it was kind of concerning to [him]."); *id.* at 51 ("It was just swelling, like pinching, kind of [a] catching feeling in my knee."). Dr. Bradley "significantly increased" Plaintiff's activity level, *id.* at 47-49, and planned to see him again in two months. Plaintiff testified that his right knee

"typically improv[ed]" after he took time off from exercising and strength-training. *Id.* at 50. Doctor DeLuca told Plaintiff that discomfort was normal and that he should "push through the discomfort." *Id.* at 51-52. Around April 11, 2018, Plaintiff reported that he was "feeling great" after running at 10 MPH on 65% of his body weight, "but still ha[d] some pinching." *Id.* at 53. On May 1, 2018, Plaintiff was unable to complete a lower body lift as part of his rehabilitative workout due to knee tightness, soreness, and fatigue. *Id.* at 56.

On May 10, 2018, while warming up in the weight room before a workout, Plaintiff twisted his knee and immediately felt "a jolt . . . in [his] knee and [a] pinching or catching [feeling.]" *Id.* at 59. Five days later, Dr. DeLuca ordered an MRI that showed "a little more extrusion of the meniscus[,] . . . no change in the [root] tear[,] a little more damage to the cartilage[,] and a [] bone bruise[.]" *Id.* at 79. Doctor Bradley prepared a diagnostic report of the MRI result, noting that Plaintiff has **a posterior root tear**, progressing arthritis, but that his graft looks "fine." *Id.* at 62-63 (emphasis added). Doctor Bradley's overall assessment noted, in part, that Plaintiff had "[p]rogressive medial compartment arthrosis [with] **a root tear and meniscus is extruding** and a PCL that is still healing." MRI Report of Dr. James P. Bradley, 5/15/18, at 10 (emphasis added). Doctor Bradley did not tell Plaintiff that the extrusion had gotten worse since his surgery, "mention anything at all about the meniscus extruding, [] discuss the meniscus root

tear[, or] discuss the fact that [he] may need a surgery to repair [his] meniscus." N.T. Jury Trial, 2/3/23, at 63-64.

After examining Plaintiff and consulting with Dr. DeLuca, Dr. Bradley opined that Plaintiff's arthritis was progressing in his knee and ordered a series of platelet-rich plasma (PRP) and Euflexxa injections to decrease inflammation. ***Id.***, 2/8/23, at 117, 119-120, 124. Doctor Bradley testified that after shutting Plaintiff's rehabilitation down for a few months, he advised Plaintiff to "start to run [] on dry land [to] get him ready . . . to progress through camps and get him ready for the preseason." ***See id.*** at 122; ***see also*** MRI Report of Dr. James P. Bradley, 5/15/18, at 10.

On May 29, 2018, Plaintiff met with Dr. DeLuca, who had been overseeing his rehabilitation. Doctor DeLuca physically examined Plaintiff and administered another series of Euflexxa and PCP injections. N.T. Jury Trial, 2/3/23, at 65-66. Doctor DeLuca did not discuss Plaintiff's torn extruded meniscus with Plaintiff and continued to carry out Dr. Bradley's protocol. ***Id.*** at 67. Doctor DeLuca testified that, even when one of his players is operated on by a surgeon outside the organization, you don't "abandon the player[, but you] butt in" if there is a problem. ***Id.*** at 69. Doctor DeLuca conducted a posterior exam of Plaintiff's knee to test the PCL—the first physical examination Dr. DeLuca had done of Plaintiff's knee since the November 2017 surgery—and "got concerned that it was loose" and also looked like the meniscus had extruded more. ***Id.*** at 80.

Doctor DeLuca testified that he was surprised Plaintiff's meniscus was not repaired during the initial surgery in November 2017 because he thought the root was torn; but, after reviewing the November 2017 intraoperative photograph prior to trial, Dr. DeLuca agreed with Dr. Bradley that Plaintiff's meniscal root was not completely torn out of the bone and that it was stable. *Id.* at 107, 114-15. On recross-examination, however, Dr. DeLuca confirmed that: Plaintiff's pre-operative October 2017 MRI showed he had a 4 mm extrusion; Plaintiff's May 2018 MRI showed a 6 mm extrusion; and Plaintiff's October 2018 MRI showed a 6 mm plus extrusion. *Id.*, 2/9/24, at 120-21.

On June 4, 2018, Plaintiff met with ROA's Dr. Dodson, who assumed the role of Philadelphia Eagles head orthopedic surgeon in June 2018. *Id.* at 131-32. Doctor Dodson administered Plaintiff's third series of anti-inflammatory Euflexxa injections and performed a PRP procedure on him. *Id.* at 138-39. In addition, Dr. Dodson ordered Plaintiff to wear an unloader brace to alleviate pain. *Id.* at 140-44. At the time, Dr. Dodson knew that Plaintiff had a meniscal root tear that Dr. Bradley had not repaired, but testified that he later confirmed with Dr. Bradley that the root tear did not have to be repaired because it was stable. *Id.* at 141, 147; *id.*, 2/3/23, at 176.

During cross-examination of Dr. Dodson, Plaintiff's counsel called into question discrepancies between Dr. Dodson's transcribed patient notes and his Eagles Training Room Notes concerning Plaintiff, dated June 4, 2018 and

July 20, 2018, respectively.[9] *See* N.T. Jury Trial, 2/9/23, at 171-184. Doctor Dodson testified that the Rothman Institute keeps a copy of his "draft notes" after he sees a patient and then "there [is] a separate set of notes at the Eagles training facility" that incorporate any changes he makes on the draft versions. *Id.* at 173. *See also id.* at 174 (Doctor Dodson testifying he is the only ROA doctor who "makes additions to [his] notes and [then] send[s] it off"). Doctor Dodson acknowledged that the confirmation codes on both sets of the training room notes are identical, signifying it is "[o]ne note" and not a separate note. *Id.* at 154. Due to the discrepancies, Plaintiff moved for an instruction regarding alteration of medical records, which the court gave to the jury. *See* N.T. Jury Trial, 2/13/23, at 24-25; *see also* 40 P.S. § 1301.511(c);[10] Pa.S.S.J.I, (Civ.) 14.40.

_____

[9] *See* Doctor Christopher Dodson Dictated Note (CCD.ram/vij/conf.#116762790), 6/4/18 ("[Plaintiff] told me he **had a previous medial meniscus root repair at the time of surgery that was not repaired[,] but simply debrided**.") (emphasis added); *but see* Eagles Training Room Final Note (CCD.ram/vij/conf.#116762790), 6/4/18 (indicating post-PCL reconstruction, Plaintiff had "subtle twisting injury and had increasing pain on the inside of his knee [and] **had a known root tear of his medial meniscus at the time of the surgery which is not addressed**") (emphasis added). *See also* Doctor Christopher Dodson Dictated Note (CCD/ram/vij/conf.#117341448), 7/20/18 ("[**Plaintiff's**] **meniscus extrusion is stable**, but he has significant interval improvement of the subchondral bone marrow edema in the medial compartment."); Eagles training Room Final Note (CCD/ram/vij/conf.#117341448), 7/20/18 (["**Plaintiff's**] **meniscus extrusion is still present but stable**. He has significant interval improvement of the subchondral bone marrow edema in the medial compartment.") (emphasis added).

[10] Section 511(c) of MCARE states:
*(Footnote Continued Next Page)*

Plaintiff testified that neither Dr. DeLuca nor Dr. Dodson ever considered or offered him the option of having his torn, extruded meniscus repaired, N.T. Jury Trial, 2/3/23, at 70, and that Dr. Dodson diagnosed him as having a "bone bruise," and decided to "shut [Plaintiff] down" for a little over one month. *Id.* at 71. Plaintiff did not run or perform any rehabilitative activities so that the knee could heal, rest, and recover. *Id.* at 75.

On July 20, 2018, at Dr. Dodson's direction, Plaintiff underwent another MRI to see if the alleged bone bruise was healing. *Id.* at 82. Doctor Dodson met with Plaintiff and told him that the MRI showed that the bone bruise was healing and that he was "going to continue to have [Plaintiff] move forward" with rehabilitation. *Id.* at 83. Doctor Dodson did not mention the extruded meniscus or recommend surgery to repair the meniscus. *Id.* Plaintiff resumed his rehabilitation and, on August 8, 2018, saw Dr. Bradley[11] who prescribed running on dry land. *Id.* Following a physical examination, Dr. Bradley told Plaintiff that his reconstructed PCL "looked great[,] . . . was solid [and that he] was happy with it." *Id.* at 86. Plaintiff continued to complain of knee pain

_____

Alteration of records--in any medical professional liability action in which the claimant proves by a preponderance of the evidence that there has been an intentional alteration or destruction of medical records, the court in its discretion may instruct the jury to consider whether such intentional alteration or destruction constitutes an adverse inference.

40 P.S. § 1303.511(c).

[11] Plaintiff testified that Dr. Dodson and "some other people" were also at his appointment with Dr. Bradley. *Id.* at 84.

- 10 -

to Dr. Bradley who told him that the pain was from the nerve endings in his knee joint, that he had to continue to use the knee, and that "those things will numb off and you'll be in less pain, you'll get over it." *Id.* at 88.

In October 2018, Plaintiff met with ROA's Dr. Pepe, concerned that he was unable to complete field workouts and "seeking other doctors[' advice] trying to get answers on what was happening and what [he] was feeling." *Id.* at 93. Plaintiff visited Dr. Dodson again on October 12, 2018, due to his leg "locking [in a] straight [position]." *Id.* at 94-95. Doctor Dodson ordered another MRI which, according to Dr. Dodson, showed that the bone bruise was back and that his cartilage had significantly degenerated. Doctor Dodson recommended Plaintiff "shut down" all rehabilitative activities for another six to eight weeks to let the bruise heal. *Id.* at 95; *id.* at 2/9/23, at 170.

Getting frustrated with his post-surgical lack of progress, in early December 2018 Plaintiff decided to meet with Dr. Robert LaPrade, a Colorado orthopedic surgeon who had been recommended as a potential surgeon for Plaintiff's initial surgery. Doctor LaPrade told Plaintiff that the reconstruction of his PCL had "failed," that his "knee was destroyed[, his] career was over at that point," and that he needed surgery immediately to fix his rapidly deteriorating cartilage. *Id.* at 86, 97-98.

In December 2018, Dr. LaPrade operated on Plaintiff, fixing his meniscus by performing an osteotomy, a procedure where a surgeon "medically break[s] your bone and [] shift[s] it to . . . take the pressure off the inside of your knee and transfer it to the outside of your knee[.]" *Id.* at 99. Plaintiff

rehabbed for six months and, in July 2019, Dr. LaPrade performed another surgery, this time re-stabilizing Plaintiff's right knee by completing a "revision double bundle PCL reconstruction with Achilles tendon." *See* Report of Matthew Lawrence Jiminez, M.D, 9/6/21, at 2. Plaintiff testified that, to this day, he still has daily pain in his knee and that "[t]he more [he does] on it, the more it hurts." *Id.* at 104.

On November 5, 2019, Plaintiff filed a professional liability action against Defendants Bradley, Burke & Bradley Orthopedics (B&B), and ROA. Plaintiff alleged that "[o]n or about May 10, 2018, an MRI of Plaintiff's right knee revealed . . . a persistent partial tear at the posterior root of the medial meniscus and meniscus extrusion," Plaintiff's Complaint, 11/5/19, at ¶ 18, and that Dr. Bradley and the ROA doctors should not have advanced Plaintiff's activity, but should have treated the knee "with an additional surgical repair." *Id.* at ¶¶ 19-22. Plaintiff claims that, due to Defendants ignoring Plaintiff's severe root tear without surgical intervention, his knee condition worsened and "hastened and contributed to the end of Plaintiff's professional football career." *Id.* at ¶ 25.

With regard to ROA, the complaint alleged that ROA was negligent strictly under a theory of agency.[12] *See id.* at ¶ 36 ("At all relevant times,

_____

[12] Appellees admit that their counsel misspoke when he stated at trial that "[t]here's no vicarious claim here. This is a direct claim against Rothman." In fact, the entirety of the trial against ROA proceeded solely on the theory of vicarious liability and the jury was instructed on that theory as well. *See* N.T.
*(Footnote Continued Next Page)*

Rothman, by and through its employees servants and/or agents (actual, ostensible[,] or otherwise), had a duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably careful orthopedic surgeon[s] and to be free from negligence."); *see also id.* at ¶ 7 ("Each and every Defendant is vicariously liable for the acts and omissions of its employees, servants[,] and/or agents[,] actual, ostensible[,] or otherwise, each of whom was acting within the course and scope of the employment relationship.").

On the evening before jury selection, ROA filed an amended witness list to include Nicole Coleman, ROA's vice-president of compliance and risk management. ROA intended to have Coleman testify regarding ROA's document management procedures in an effort to rebut Plaintiff's counsel's suggestion on cross-examination that ROA physician, Dr. Dodson, had altered Plaintiff's medical records. *See supra* at 8-9; *supra* at n.8. Plaintiff filed a motion to strike the late witness disclosure. The trial court entered an order on January 31, 2023, granting Plaintiff's motion to strike and precluding

_____

Jury Trial, 2/13/23, at 20 ("You must decide whether Dr. Bradley and/or the Rothman physicians were negligent. If you decide that the Defendants were negligent, then you must decide whether the Defendants' negligence was a factual cause of Mr. Maragos's injuries. If you so decide, you must decide the amount of damages that the Plaintiff sustained as a result of Defendants' negligence"). Moreover, the parties stipulated as to the agency theory with regard to the ROA doctors as it applied to Defendant ROA. *See* N.T. Jury Trial, 2/9/23, at 212.

Coleman from testifying at trial. *See* Order, 1/31/23. *See also* Pa.R.C.P. 212.2.[13]

A jury trial was held over two weeks from the end of January 2022 through mid-February 2023. Plaintiff's expert in orthopedic surgery, Matthew Lawrence Jimenez, M.D., testified that as a result of Plaintiff's collision during the October 2017 Panther's game, Plaintiff suffered a root tear of the medial meniscus[14] resulting in meniscal extrusion in his right knee.[15] *See* N.T. Jury Trial, Vol. I, 1/30/23, at 70; *see also* Report of Matthew Lawrence Jiminez, M.D., 9/6/21, at 1 ("[A]n MRI to [Plaintiff's] right knee [] revealed a meniscal

_____

[13] Rule 212.2(c) provides:

> Where the trial judge determines that unfair prejudice shall occur as a result of the non-compliance with subdivisions (a) and (b), the trial court shall grant appropriate relief which may include[:]
>
> > (1) the preclusion or limitation of the testimony of
> >
> > > (i) any witness whose identity is not disclosed in the pre-trial statement[.]

Pa.R.C.P. 212.2(c).

[14] A meniscus root tear is a tear at the junction of the knee's meniscus and bone. *See* https://www.mayoclinic.org/medical-professionals/orthopedic-surgery/news/advances-in-treatment-of-meniscus-root-tears/mac-20558318 (last visited on 8/19/24).

[15] Doctor Jiminez compared Plaintiff's October 13, 2017 MRI with the results of an MRI taken in September 2015, and noted that the 2015 MRI identified "a normal-appearing, intact meniscus with no abnormality, variant[,] or anomaly." Report of Matthew Lawrence Jiminez, M.D., 9/6/21, at 2. Moreover, subsequent MRIs of Plaintiff's right knee, taken in 10/2017, 5/2018, 7/2018, and 10/2018, all showed a tear to the posterior root of the medial meniscus with extrusion. *Id.* at 3.

root tear with extrusion of the medial meniscus); *id.* at 2. Doctor Jiminez opined that the meniscal root was unstable because there was a 4mm extrusion and that an extrusion gets progressively worse as cartilage wears away over time. N.T. Jury Trial, Vol. I, 1/30/23, at 70 ("His PCL is repaired and remains stable nearly the entire rehab portion . . . [b]ut we saw right away from the first MRI the meniscus was extruded from day one, four millimeters[,] and continued to extrude over several months."). Moreover, because of the instability due to the torn root, the meniscus "did not stay where it was supposed to be [and, thus, caused the] cartilage [to] w[ea]r out." *Id.* at 71; *id.* at 72. Further, Dr. Jimenez opined that, to a reasonable degree of medical certainty, Dr. Bradley deviated from the professional standard of care by not repairing, in November 2017, Plaintiff's torn medical meniscus root, and that the ROA doctors also breached that standard because they had an obligation as "orthopaedic surgeons caring for [Plaintiff to] talk to a surgeon [and] debate the care[,] look at the images, document that debate[,] and make a solid decision." *See id.* at 73-74, 77; *see also id*. at 97 (Doctor Jimenez testifying, "By seeing extrusion[—]you know instability[—] ] . . . it is going to likely continue to extrude so the mandate is to, first, if you are not going to fix it with that MRI and that exam and that history, you [have] to spend a lot of time documenting why."); *id.* at 98 (part of documenting issue is "testing the stability of the root aggressively to support" the decision not to repair root). Finally, Dr. Jimenez testified that without repairing a "complex" root tear like Plaintiff's that involved "instability[,] it is not just

going to heal itself[,] you need to get stability back [and] have it firmly attached [so that it can] he[al]." *Id.* at 100. Doctor Jiminez's expert report also noted that several radiologists[16] confirmed that Plaintiff suffered a tear at the posterior root of his right knee's medial meniscus with extrusion and that the size of the tear increased over time to approximately 6mm due to instability. *See* Report of Matthew Lawrence Jiminez, M.D., 9/6/21, at 3-4.[17]

Following trial, the jury returned a verdict in favor of Plaintiff in the amount of $43.5 million, apportioning liability at 67% for Dr. Bradley and 33%

_____

[16] Radiologist Carolyn Boltin, M.D., Plaintiff's expert, testified that, to a reasonable degree of medical certainty, Plaintiff's October 2017 post-injury MRI showed that he suffered an extrusion of the medial meniscus from his incident, which included a complex root tear, and that over time, the degree of extrusion increased from mild to severe and that ultimately resulted in thinning and loss of cartilage. *See* N.T. Jury Trial, 2/1/23, at 40-54.

[17] Doctor Jiminez' report noted that, in coming to his professional opinion on the matter, he had "examined [Plaintiff], reviewed the medical records, radiology and corresponding reports, intraoperative images and video (where available), deposition transcripts[,] and [] other materials." *See* Matthew Lawrence Jiminez, M.D., Report, 9/6/21, at 1. Doctor Jiminez ultimately concluded that Dr. Bradley and the ROA doctors were "grossly negligent" and breached the standard of care where they failed to: "inform [Plaintiff] that he suffered the meniscal root tear[;] offer to scope his knee to investigate further[; and inform him] of the potential risks associated with training, rehabilitation[,] and running on a knee with a known root tear with meniscal extrusion." *Id.* at 9. Doctor Jiminez opined that the standard of care required Dr. Bradley and the ROA doctors "to restrict [Plaintiff's] rehabilitation to range-of-motion exercises and light activity [and] refrain from ordering and implementing rehabilitation involving significant weightbearing or loading exercises until the root tear . . . was addressed." *Id.* at 6. Doctor Jiminez opined that Defendants' breach caused Plaintiff to suffer "unnecessary and unreasonable pain[, led to] his inability to play NFL football, [and] w[as] a substantial factor in [Plaintiff] needing [two] future total knee replacement[s]." *Id.* at 9-10.

for ROA. On February 23, 2023, ROA filed a post-trial motion seeking a judgment notwithstanding the verdict (JNOV), a new trial on all issues, a new trial on damages, and remittitur of the jury's verdict. The trial court denied ROA's post-trial motions.

ROA filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. ROA presents the following issues for our consideration:

(1)    Whether the trial court erred in denying Defendant ROA's request for JNOV, where Plaintiff only sued ROA for vicarious liability[,] but failed to prove that any agent or employee of Defendant [ROA] breached an objective standard of care that caused Plaintiff's harm?

(2)    Whether the trial court erred and/or abused its discretion when it gave the jury a spoliation/adverse inference instruction when there was no evidence that any document had been spoliated or improperly altered, Plaintiff failed to satisfy the strict standard for a spoliation/alteration instruction, and Defendant ROA suffered undue prejudice because the instruction improperly invited and permitted the jury to find, without any basis, that ROA spoliated evidence?[18]

(3)    Whether the trial court abused its discretion in denying Defendant [ROA's] new trial request after the trial court improperly, and to Defendant [ROA's] great prejudice, precluded a defense witness from testifying in a manner that would have rebutted accusations that Defendant [ROA] had improperly "altered" documents and engaged in a "cover-up," where the proposed testimony would have been

_____

[18] An appellate court "review[s a] trial court's jury instructions for an abuse of discretion or legal error controlling the outcome of the case." **Cragle v. O'Brien**, 225 A.3d 182, 190 (Pa. Super. 2019) (citations omitted).

- 17 -

succinct and circumscribed and Plaintiff failed to prove any undue prejudice from the admission of the testimony?[19]

(4)    Whether the trial court erred and/or abused its discretion in denying Defendant ROA's motion for [a] new trial, a new trial on damages, or at least a substantial remittitur, where the jury's determination of liability and causation was against the overwhelming weight of the evidence, and the $43,500,000[.00] damages award was excessive, unfair[,] and likely driven by Plaintiff's incendiary claim of a "cover up"?[20]

_____

[19] In determining whether to preclude the testimony of a witness who has not been identified in a pre-trial statement, our courts have considered:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith [or] willfulness in failing to comply with the court's order.

**Feingold v. S.E. Pennsylvania Transp. Auth.**, 517 A.2d 1270, 1273 (Pa. 1986) (citations omitted).

[20] In **Tindall v. Friedman**, 970 A.2d 1159 (Pa. Super. 2009), our Court stated:

Our standard of review in reversing an order denying a remittitur by a trial court is confined to determining whether there was an abuse of discretion or an error of law committed in such denial. **Smalls v. Pittsburgh-Corning Corp.**, [] 843 A.2d 410, 414 (Pa. Super. 2004).

The grant or refusal of a new trial because of the excessiveness of the verdict is within the discretion of the trial court. **Hall v. George**, [] 170 A.2d 367 ([Pa.] 1961). This court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. **Kravinsky v. Glover**, [] 396 A.2d 1349 [(Pa. Super.] 1979). We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should

*(Footnote Continued Next Page)*

Appellant's Brief, at 5-6.

In ***Scampone v. Highland Park Care Ctr., LLC***, 57 A.3d 582 (Pa. 2012), our Supreme Court discussed the concept of vicarious liability in the context of a medical malpractice action:

> To prove negligence, a plaintiff may proceed against a defendant on theories of direct and vicarious liability, asserted either concomitantly or alternately. Liability for negligent injury is direct when the plaintiff seeks to hold the defendant responsible for harm the defendant caused by the breach of a duty owing directly to the plaintiff. By comparison, vicarious liability is a policy-based allocation of risk. Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it. Once the requisite relationship (i.e., employment, agency) is demonstrated, the innocent victim has recourse against the principal, even if the ultimately responsible agent is unavailable or lacks the ability to pay. ***Mamalis v. Atlas Van Lines, Inc.***, [] 560 A.2d 1380, 1383 (Pa. 1989); ***accord Crowell*** [***v. City of Philadelphia***], 613 A.2d [1178,] 1182 [(Pa. 1992)] (vicarious liability is policy response to "specific need" of how to fully compensate victim).
>
> Where a corporation is concerned, the ready distinction between direct and vicarious liability is somewhat obscured because we accept the general premise that the corporation acts through its officers, employees, and other agents. ***See Tayar v. Camelback Ski Corp., Inc.***, [] 47 A.3d 1190, 1196 (Pa. 2012). The corporation, as principal, assumes the risk of individual agents' negligence under the theory of vicarious liability. ***See, e.g., Iandiorio v. Kriss & Senko Enters., Inc.***, [] 517 A.2d 530 (Pa. 1986); ***Aiello v. Ed Saxe Real Estate, Inc.***, [] 499 A.2d 282 (Pa.

_____

> apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive. ***Mineo v. Tancini***, [] 502 A.2d 1300 ([Pa. Super.] 1986).

***Id.*** at 1176-77 (citations and ellipsis omitted).

1985). In this scenario, the corporation's liability is derivative of the agents' breach of their duties of care to the plaintiff. But, this Court has also recognized that a corporation may also owe duties of care directly to a plaintiff, separate from those of its individual agents, such as duties to maintain safe facilities [] and to hire and oversee competent staff. *See, e.g.*, *Thompson* [*v. Nason Hospital*, 591 A.2d 703 (Pa. 1991)] (corporate hospital owed patient non-delegable duty of care to enforce consultation and patient monitoring policies); *Gilbert v. Korvette, Inc.*, [] 327 A.2d 94, 102 (Pa. 1974) (corporation owed customer non-delegable duty of care to maintain premises); *Dempsey v. Walso Bureau, Inc.*, [] 246 A.2d 418 (Pa. 1968) (corporation owed employee duty of reasonable care in hiring other employees); *accord Atcovitz v. Gulph Mills Tennis Club, Inc.*, [] 812 A.2d 1218 (Pa. 2002) (if duty exists, corporation may be held directly liable for negligence). Accordingly, as a general proposition, the recognition that a corporation acts through its agents has not been held to be a fatal impediment to ha[i]ling a corporation into court on direct liability tort claims. *Accord Mamalis*, 560 A.2d at 1383 ("termination of the claim against the agent extinguishes the derivative [vicarious liability] claim against the principal" but not separate claim based on principal's "affirmative act or failure to act when required to do so").

*Scampone*, 57 A.3d at 597-98 (some internal citations and quotation marks omitted).[21]

After a comprehensive review of the parties' briefs, certified record on appeal, and the relevant case law and statutes, we affirm on the basis of Judge Cunningham's opinion. *See* Trial Court Opinion, 12/19/23, at 7 (court properly denied JNOV where Dr. Jiminez testified, to reasonable degree of

_____

[21] To the extent that ROA claims, based on the wording of the verdict slip, Plaintiff failed to obtain a finding that any ROA agent or employee was negligent because it only listed Rothman and not the individual Rothman doctors, we find that this claim has been waived where defense counsel agreed to the wording of the verdict slip. *See* N.T. Jury Trial, 2/9/23, at 208 ("[THE COURT:] You're okay with the Plaintiff's verdict slip? [DEFENSE COUNSEL:] Yes.").

medical certainty, Plaintiff's meniscus tear should have been surgically repaired in initial surgery, intense exercise on unrepaired tear led to further damage to meniscus and entire knee, no rehabilitation should have occurred until meniscus repaired, ROA doctors who supervised and continued to encourage rehabilitation on Plaintiff's knee over complaints of pain and discomfort violated standard of care); *id.* at 9 (Medical Care Availability and Reduction of Error (MCARE) alteration of records instruction properly given where testimony showed substantive and material differences between Dr. Dodson's draft notes and transcribed Eagles notes); *id.* at 9 (Coleman properly precluded from testifying where non-expert witness identified on eve of jury selection, Plaintiff had no time to depose Coleman, and no reason why ROA could not have identified witness sooner); *id.* at 10-11 (verdict not against weight of evidence where jury chose to believe Dr. Jiminez's testimony that ROA defendants, as agents, increased risk of harm to Plaintiff by continuing to rehabilitate him); and *id.* at 11 (new trial not warranted on basis of excessive verdict where record evidence established Plaintiff was highly esteemed and paid NFL player projected to secure future contract and non-economic damages difficult to quantify).  We instruct the parties to attach a copy of Judge Cunningham's decision in the event of further proceedings in the matter.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date: 8/30/2024

**IN THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**

| | |
|---|---|
| CHRISTOPHER MARAGOS, | COURT OF COMMON PLEAS |
| | PHILADELPHIA COUNTY |
| *Plaintiff* | |
| | |
| vs. | No. **191100972** |
| | 2310 EDA 2023 |
| JAMES P. BRADLEY, M.D., UPMC | 2312 EDA 2023 |
| COMMUNITY MEDICINE, INC., and | |
| RECONSTRUCTIVE ORTHOPAEDIC | |
| ASSOCIATES II, P.C. | |
| | OPFLD-Maragos Vs Bradley Etal |
| *Defendants/Appellant* | |



19110097200185

## OPINION

Defendant Reconstructive Orthopaedic Associates II, P.C. appeals this Court's July 24, 2023 Order denying Defendant's post-trial motion and entering judgement in favor of the Plaintiff. We file this Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a) and ask that the Superior Court affirm.

## FACTUAL BACKGROUND

Plaintiff grew up outside of Milwaukee, Wisconsin and always had a passion for football. Following stints playing college football at Western Michigan University and University of Wisconsin, as a walk-on at both schools, Plaintiff was able to fulfil his dream of playing in the National Football League. While he was not drafted, Plaintiff was able to sign with the San Francisco 49ers as an undrafted free agent. N.T. 2/3/23 at 12. In Plaintiff's own words it "was exciting. I remember the day. You know, life-long dream to play in the NFL. It was coming true." *Id.* Following two seasons with the 49ers where Plaintiff was playing special teams, he was cut. But that was not the end of his dream. The Seattle Seahawks called Plaintiff and offered

him a tryout after which he was signed to a two-year contract. On the Seahawks, Plaintiff played every game on special teams as well as getting snaps as a safety and ultimately played in the 2013 Super Bowl where the Seahawks lifted the Lombardi trophy. *Id.* at 15.

Following the Super Bowl, the Seahawks did not resign Plaintiff and he became a free agent. He then signed a three-year approximately $4,000,000 contract with the Philadelphia Eagles which made him one of the highest paid special teamers in the league. *Id.* at 17. Plaintiff played out the contract and missed only one game with a quad contusion during that three-year span. *Id.* Prior to his contract ending, the Eagles extended Plaintiff another three years, this time for $6,000,000 making him the highest paid special teamer in the league. During that time Plaintiff was also voted three times to the NFL Pro Bowl, an all-star game for the best players in the league. *Id.* at 19.

For the first time in history, the Eagles elected team captains for the 2017 season. Plaintiff was elected as one of the captains. *Id.* at 21. Plaintiff continued to play at a high level and was a leader of the team. On October 12, 2017, the Eagles played the Carolina Panthers on Thursday Night Football. Late in the game, with the Eagles in the lead, Plaintiff took the field while the Eagles punted the ball. The punt was recovered by Christian McCaffrey who then attempted to evade Plaintiff as he gunned down the field to make a tackle. *Id.* at 28. As Plaintiff attempted to reach out and tackle McCaffrey he felt a blow to his leg and next thing he recalled was laying on the ground in severe pain. As Plaintiff had planted his foot to make the tackle, a Panther player was blocked into Plaintiff's knee and caused hyperextension.

Plaintiff was removed from the game and the next day received an MRI on his right knee. The Eagles team physician, Dr. DeLuca, discussed the results of the MRI with Plaintiff and began to suggest other physicians who could potentially repair the injuries sustained by Plaintiff.

2

Plaintiff was told that he had a torn PCL, torn meniscus, and torn LCL. Plaintiff ultimately chose Defendant Bradley, the team physician for the Pittsburgh Steelers, to perform the surgery on his right knee because he understood Defendant Bradley to be the best surgeon for this type of injury to the PCL. N.T. 2/3/23 at 30. On November 8, 2017, Plaintiff underwent surgery on his knee. Following surgery, Plaintiff spoke with Defendant Bradley and Defendant Bradley told him that the surgery went great and the PCL was fixed but that the meniscus did not need repair.

Plaintiff then returned to Philadelphia to begin his rehab with Defendant ROA's doctors who work with the Eagles. The rehab consisted of working out on a bike to start strengthening the knee then building up to more strenuous activities like running on a machine called the AlterG, a treadmill that is able to simulate running with reduced body weight. Eventually, Plaintiff was able to attempt running with full body weight. *Id.* at 39-40. During this rehab, Plaintiff was able to watch his teammates lift the Lombardi trophy after winning the Super Bowl in 2018. As the rehab continued to become more intense, Plaintiff began to feel aches, pains, and other discomfort in his knee. He made this clear to the trainers and physicians who were supervising his rehab and they told him that it was normal and he needed to push through the discomfort to fully heal. *Id.* at 51. Plaintiff continued to push through and continued to have pain and setbacks in his rehab. On May 10th, 2018, Plaintiff was rehabbing under Defendant ROA's physicians supervision when he felt a "click/snap" in his right knee. *Id.* at 59. This click occurred when Plaintiff turned to walk towards the AlterG and sent a jolt sensation up his leg.

At this point another MRI was ordered and Plaintiff returned to Pittsburgh to see Defendant Bradley. At this meeting, Defendant Bradley reviewed the new MRI and diagnosed Plaintiff with a posterior root tear. *Id.* at 62. The meniscus in the right knee was also extruded but Plaintiff does not recall Defendant Bradley informing him of that. *Id.* Plaintiff began to receive

3

injections in his knee that were supposed to alleviate the discomfort and assist in the recovery. His rehab continued on schedule. Plaintiff saw Dr. Dodson, a new team physician for the Eagles, and Dr. Dodson told Plaintiff that he should shut down his rehab to let his knee heal which confused Plaintiff since Defendant Bradley and Dr. Deluca had continued to tell him to push through the discomfort. *Id.* at 71. After shutting down for a month, Plaintiff's knee felt better but the discomfort returned as he returned to rehab. Plaintiff continued to push through as directed by the physicians. In August of 2018, Plaintiff finally began to run on dry land again, putting full body weight onto his knee. *Id.* at 90. After working out for several months with varying degrees of intensity, all while enduring the pain, Plaintiff received a final MRI. In this MRI, Dr. Dodson saw that the bone bruise had returned and Plaintiff had to be shut down again. *Id.* at 95. Finally, Plaintiff sought another opinion and saw Dr. LaPrade in Colorado in December 2018. At this visit, Plaintiff heard that his dream career in the NFL was over: his knee was destroyed. *Id.* at 97. Plaintiff was going to need career-ending knee surgery to attempt to reduce the pain he was feeling.

During the testimony of Dr. Dodson, evidence was introduced that there were two sets of notes produced during Plaintiff's visits. The first set of notes was produced by Defendant ROA and the second set of notes was produced by the Eagles. The notes produced by the Eagles were included in Plaintiff's training record and contained varying information from the notes produced by Defendant ROA. For example, on July 20, 2018, Dr. Dodson's note from Defendant ROA states that he reviewed the May 10, 2018 MRI with Plaintiff and they will continue with his rehab and start to ramp up. However, the note produced by the Eagles is identical with three sentences added. These sentences state" [Plaintiff] understands the complexity of his knee issue and that there is a chance that with increased loading his symptoms may return which would not

4

allow [Plaintiff] to play or play in a limited fashion. [Plaintiff] has said to me that he wants to try and do everything possible in order to return to play. We will continue to monitor based on [Plaintiff's] symptoms and feedback from PT staff." See Ex. Eagles 475.

Plaintiff tried his hardest to rehab from the original surgery and put his trust in the physicians and trainers that they were doing their best to get him back on the field. Unfortunately, the original surgery did not address the total damage that was done and pushing through the pain and discomfort ultimately destroyed Plaintiff's knee and prevented him from returning to the field.

## PROCEDURAL HISTORY

Plaintiff filed the Complaint in this matter on November 5, 2019. Jury selection occurred on January 26, 2023. Trial commenced on January 30, 2023. Following eleven days of trial, the jury reached its verdict on February 13, 2023. The jury found Defendant ROA to be 33% liable for the total award of $43,500,000. Plaintiff filed a motion for delay damages on February 17, 2023. Defendant ROA filed a post-trial motion on February 23, 2023. Oral arguments on the post-trial motion occurred on July 12, 2023 and then reconvened on July 24, 2023. On July 24, 2023, this Court denied Defendant ROA's post-trial motion and granted Plaintiff's motion for delay damages as modified by Defendant ROA's share of the liability. Judgement on the verdict was entered on August 1, 2023. Defendant ROA filed their notice of appeal on August 31, 2023.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

On September 5, 2023 this Court issued an Order pursuant to Pa.R.A.P.§1925(b) requiring Appellant to file a concise statement of errors complained of on appeal no later than

5

twenty-one (21) days after entry of the Order. Additionally, the Order stated that "[a]ny issue not properly included in the statement timely filed and served pursuant to subdivision (b) of the rule shall be deemed waived." See Pa.R.A.P. §1925(b)(3)(iv).

Defendant filed a Concise Statement on September 12, 2023 and has complained of five matters on appeal. The statement raised the following issues, *verbatim*:

1. The trial court committed an error of law and/or abuse of discretion when it denied Defendant ROA's motion for judgement n.o.v. on the basis that the verdict was unsupported by sufficient evidence and no two reasonable minds could disagree that the verdict should have been rendered for Defendant ROA.

2. The trial court erred and/or abused its discretion when it denied Defendant ROA's motion for a new trial based on the preclusion of the testimony of Defendant ROA witness Nicole Coleman.

3. The trial court erred and/or abused its discretion when it denied Defendant ROA's motion for a new trial based on the issuance of an "alteration" or "adverse inference" jury instruction.

4. The trial court erred and/or abused its discretion when it denied Defendant ROA's motion for a new trial on the basis that the verdict was against the weight of the evidence.

5. The trial court erred and/or abused its discretion when it denied Defendant ROA's motion for a new trial on the basis that the jury's award of damages was against the weight of the evidence.

## DISCUSSION

**I.    This Court did not err in denying judgement n.o.v. where there is sufficient evidence that supports the jury's verdict.**

The standard of review in deciding judgement n.o.v. motions is clear. The 'evidence must be considered in the light most favorable to the verdict winner, and [they] must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in [their] favor." *Petrasovits v. Kleiner*, 719 A.2d 799, 802-03 (Pa. Super. 1998). The Superior Court stated in *Ely v. Susquehanna Aquacultures, Inc.* that if there is any basis "upon which the jury could properly have made its award," the verdict will not be overturned. 130 A.3d 6, 10 (Pa. Super. 2015). Furthermore, judgement n.o.v. "may not be employed to invade the province of the jury. Thus, questions of fact must be resolved by the jury." *Ludmer v. Nernberg*, 433 Pa.Super. 316, 322 (1994) (citing *Trawick v. Nationwide Mutual Insurance Co.*, 363 A.2d 1265 (Pa. Super. 1976).

Plaintiff offered Dr. Jimenez as an expert in the field of orthopaedic surgery. He first testified that the surgery was improper where it did not address the meniscus tear. N.T. 1/31/23 at 30. He testified that if the meniscus is not in its proper place and intense exercise or work is done it can lead to further damage to the meniscus and therefore the entire knee. *Id.* Second, Dr. Jimenez stated that, in his opinion, no rehab should have occurred until the meniscus was repaired. *Id.* at 31. Throughout his testimony, Dr. Jimenez made it clear that the continued rehab of Plaintiff's knee over Plaintiff's complaints of pain and discomfort was a clear violation of the standard of care. This testimony paired with Plaintiff's testimony regarding the multiple agents of Defendant ROA who supervised and encouraged his rehab is considerable evidence for a jury to find that Defendant ROA breached the standard of care through the actions of its agents.

7

Defendant ROA seeks to disregard the evidence presented by Plaintiff that the jury clearly accepted as true based upon its verdict. Furthermore, the evidence must be read in the light most favorable to Plaintiff. The testimony of Dr. Jimenez, an expert in orthopaedic surgery, along with the first-hand account of Plaintiff constitute sufficient evidence for the jury's verdict. This Court did not err in denying judgement n.o.v.

## II.     The Court did not err in denying a new trial based on the preclusion of Nicole Coleman as a witness.

The decision to admit or exclude evidence is at the discretion of the trial court. In the instance of late-identification of a non-expert witness, the Superior Court has previously affirmed the decision to preclude a late-identified witness. In *Davis v. Borough of Montrose*, the Superior Court affirmed a trial court decision to exclude a witness identified eight days prior to trial where the defendant did not justify why it had failed to identify the witness sooner. 194 A.3d 597, 606-07 (Pa. Super. 2018).

On the eve of jury selection, Defendant ROA filed an Amended Witness List that included Nicole Coleman for the first time in litigation. Ms. Coleman was not known to Plaintiff prior to this disclosure. Plaintiff had no time to depose Ms. Coleman prior to the trial. Ms. Coleman had been known to Defendant ROA for some time as a custodian of the medical notes taken for the Eagles training room staff. She was proffered as a witness to explain how the notes were kept and maintained. There is no reason why Defendant ROA couldn't have identified her sooner and permitted Plaintiff to depose Ms. Coleman.

Plaintiff would have been unfairly prejudiced if Ms. Coleman was admitted to testify due to the late identification on the part of Defendant ROA. Therefore, this Court did not err in precluding her testimony.

**III.  This Court did not err in instructing the jury regarding the alteration of the medical notes presented at trial.**

The jury instruction given by this Court are based on the codification of the law as written in the MCARE Act. Section 1303.511(c) states:

Alteration of records – in any medical professional liability action in which the claimant proves by the preponderance of the evidence that there has been an intentional alteration or destruction of medical records, the court in its discretion may instruct the jury to consider whether such intentional alteration or destruction constitutes an adverse inference.

The notes in question are the notes of Dr. Dodson. Due to Plaintiff seeking notes from both the Eagles and Defendant ROA, they received two sets of notes for the same group of visits. Plaintiff noticed that some of the notes were different for the exact same office visits. The differences in the notes were not syntax or grammatical edits but instead were substantive differences in the notes. Along with the example cited in the facts above, there are at least three other notes with substantive differences. Dr. Dodson tried to explain the differences to the jury as simple dictation edits but that explanation leaves much to be desired. On the July 20, 2018 note, three key sentences appeared on the Defendant ROA note that were not hinted at in the Eagles note. These sentences seek to show that Plaintiff was aware of the dangers of rehabbing his

9

injury when Plaintiff clearly testified that he was unaware of the dangers posed by his partially repaired knee.

Plaintiff presented sufficient evidence that there were alterations made to the notes that were not properly explained. This evidence was sufficient for this Court to give the alteration jury instruction as contemplated in the MCARE Act. Therefore, this Court did not err in giving the alteration instruction.

## IV.     This Court did not err in denying a new trial based on the weight of the evidence.

In medical malpractice cases, plaintiffs must "present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and accepted medical standards, and that such deviation was the proximate cause of harm suffered." *Mitzelfelt v. Karmin*, 584 A.2d 888, 891 (Pa. 1990). When analyzing a claim that a verdict is against the weight of the evidence, the court must apply the shocks-the-conscience test. Furthermore, the trial judge's authority to award a new trial on weight of the evidence grounds is narrowly circumscribed on account of the principle that credibility questions are exclusively for the fact finder. *Commonwealth v. United States Mineral Prods. Co.*, 956 A.2d 967, 973 (Pa. 2008).

The sufficiency of the evidence presented by Dr. Jimenez has already been discussed above. If Defendant seeks a new trial on this basis due to the testimony of their experts compared to the testimony of Dr. Jimenez, they disregard the law on this issue. It is not up to the trial court to compare and decide conflicts of testimony. This Court must give the jury's determination and subsequent verdict immense weight in its own determination. As it

pertains to liability, Dr. Jimenez testified that the actions of Defendant ROA's agents increased the harm to Plaintiff as he continued to rehab his injury through the pain.

Defendant also sought a new trial on the basis that the award was against the weight of evidence. While $43,500,000 is a large amount of money (for which Defendant ROA is only partially responsible), it does not shock the conscience where the Plaintiff in question was a professional football player at the highest level. Plaintiff's economic losses near $9,000,000 evidenced by his contract at the time of his injury as well as a reasonable projection for a future contract had he continued to play which he intended to do. Non-economic damages are inherently difficult to quantify. Defendant ROA seeks to challenge the award on the grounds that the total award is more than four times the amount of economic damages. However, there is no bright-line rule in the Commonwealth that prohibits such a ratio or a ratio that is even larger.

Plaintiff not only lost his job, he lost his dream. Playing in the NFL is the dream of so many kids in this country and so few get to realize it. Yet, through his hard work and dedication to his craft and body, Plaintiff was able to overcome the obstacles in his way and reach the very top of the game. At the time of his injury, Plaintiff was the highest paid special teamer in the NFL and there was no indication that his abilities were in decline. Putting a price tag on a dream is not an easy task. In the instant case, the jury considered the evidence presented to reach their verdict and it does not shock the conscience where Plaintiff went from a dream job in the NFL to a lifetime of pain and disability resulting from the improper repair and rehab of his knee injury.

This Court did not err where there is sufficient evidence on both liability and damages to support the jury's verdict.

11

## CONCLUSION

For the foregoing reasons, we respectfully request the Superior Court to affirm this Court's decision.

BY THE COURT:

December 19, 2023                 HON. CHARLES J. CUNNINGHAM, III

12